754 So.2d 765 (2000)
Rubin OTERO, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D99-106.
District Court of Appeal of Florida, Third District.
March 8, 2000.
Rehearing Denied April 19, 2000.
*766 Bennett H. Brummer, Public Defender and Sydney P. Smith, Special Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General and Consuelo Maingot, Assistant Attorney General, for appellee.
Before GODERICH, GREEN, and RAMIREZ, JJ.
Rehearing En Banc Denied April 19, 2000.
PER CURIAM.
The appellant, Rubin Otero, was charged with and convicted of burglary with an assault, robbery, grand theft of a vehicle, false imprisonment and abuse, neglect, or exploitation of an aged or disabled person, following a jury trial.
According to the state's evidence at trial, the victim in this case, Kenny Lindheimer, is a deaf mute who also suffers from cerebral palsy. On or about July 5, 1996, Mr. Lindheimer awakened at his apartment in North Miami at approximately 2:30 a.m. and decided to drive to Biscayne Boulevard to employ the services of a prostitute. *767 He spotted a woman whom he had seen on prior occasions and whose nickname was Angel. He invited her into his Mustang. Lindheimer informed Angel in writing that he was deaf and requested the amount for her services. Angel replied $40. Lindheimer did not have that $40, however, they drove to a nearby ATM machine where he withdrew $50. Angel then requested that he stop by a store to buy her some beer. Lindheimer drove to a store, got out and left the key in the car's ignition.
Upon his return with the beer, he noticed that Angel and his car were gone. He returned to the store and asked the cashier to call the police. After waiting on the police's arrival for some time, Lindheimer decided to walk home. As he was walking, he spotted a police car and flagged it down. He communicated with the police through sign language and informed them that his car had been stolen. He did not, however, tell the police that he knew that a prostitute had stolen his car or that he could describe the thief. The police returned him to the scene of the crime and later took him home.
The next day, while Lindheimer was watching television at his home, at approximately 11:00 a.m., Angel and a man that Lindheimer identified as Otero entered his living room without permission. Once there, they communicated with Lindheimer by writing notes on a yellow note pad which was introduced into evidence. They demanded $189 from Lindheimer claiming that his Mustang had been towed. They also requested his ATM card and PIN number. Lindheimer offered only to give them $60 in exchange for his keys.
At that point, a physical struggle ensued when, according to Lindheimer, Otero grabbed him by the throat and began to choke him and Angel grabbed him by the legs causing him to fall. Otero began to pound Lindheimer's head on the floor and grabbed Lindheimer's wallet containing $62, a social security card, driver's license, an ATM card and a condom. Lindheimer lost consciousness for a period of time. When he awoke, Otero and Angel were gone and he telephoned the police by using a deaf relay service. When the police arrived, he told them what had happened through the use of a TTY deaf translation machine. It was at that time that Lindheimer first informed the police that his Mustang had been stolen earlier by a prostitute named Angel and gave them a description of her and Otero. The yellow notepad used by Lindheimer to communicate with his attackers was tested for fingerprints. A patrol officer from the City of North Miami Beach testified that on July 5, 1996, he came into contact with a Mustang with an occupant obstructing traffic in the middle of a roadway. The officer initially decided to simply pass by this vehicle for the purpose of giving the occupant an opportunity to see him and simply move the vehicle. When the officer made a U-turn and came back, he noticed that the Mustang was still there and the occupant was in the driver's seat. The officer positioned his vehicle right behind the Mustang and ran a check on its tag number.
The driver of the Mustang, who the officer identified as Otero, exited the Mustang. The officer ordered Otero back into the vehicle and requested his driver's license. Once the officer returned to his vehicle to run a check on Otero's license, he learned from the dispatcher that the Mustang was stolen and had been used in a home invasion robbery. He also learned that Otero's license had been suspended. The officer requested back-up assistance and when it arrived, Otero was taken into custody and placed into the back seat of another police vehicle. While there, Otero asked the officer why he was being arrested. Otero was informed that the Mustang had been reported stolen. In response, Otero stated that the car was not stolen and that it belonged to his girlfriend. He further stated that he had been sitting in the Mustang waiting for a male friend to return from a nearby apartment.
*768 Once Otero was taken to the police station, he was photographed. Thereafter, a photographic lineup containing Otero's picture was taken to Lindheimer's home. According to the police, Lindheimer excitedly and emphatically pointed out Otero as the male home invasion robber. Lindheimer was then brought to the police station to identify his Mustang. While there, Lindheimer retrieved his wallet, which still contained his ATM card, from the car.
The state also introduced the testimony of the fingerprint technician who dusted Lindheimer's apartment for prints. The technician testified that he was unsuccessful at getting fingerprints at the apartment. Further, although Lindhheimer had stated that Otero had touched the yellow note pad found in Lindheimer's apartment, the technician was unable to retrieve Otero's prints from the pad.
The defense called Officer Reed, of the Miami Shore Police Department, who testified that he spoke to Lindheimer through his TTY machine at his apartment. Lindheimer described his male attacker as being 5'9", weighing 180 pounds and having no special identifiers such as a tattoo or scar.
Otero testified on his own behalf and denied any involvement in the crimes charged. He stated that he had been hospitalized and was released just three days before his arrest. At that time, he weighed 130 pounds and was in poor physical condition. At the time of trial, he had gained 30 pounds in jail because of medicines that were not available at the time of his arrest. He showed the jury a tattoo above his left bicep, which he has had for 10 years and which is lower than where the sleeve of the T-shirt would cover.
Otero further testified that he first came into contact with the victim's vehicle at a gas station earlier on the day of his arrest. At the time, the driver of the car was a lady named Angel and she had another female passenger. Otero and Angel struck up a conversation and she invited him to join them in the car. Otero agreed to accompany her to the beach after she dropped off her female passenger. After they left the beach, they drove to another location where Angel had to meet someone. She gave Otero the keys to the car and told him to return to meet her in an hour.
Otero drove to Biscayne Boulevard and ran into a male friend, C.J., who needed a ride. Otero drove him to the location where the arrest subsequently took place. Otero testified that he thought that he was being arrested for driving with a suspended license and that he had no idea that the car was stolen and/or had been involved in a robbery. Finally, Otero acknowledged that he had previously been convicted of four crimes involving dishonesty and moral turpitude. The defense rested. Otero was convicted as charged and sentenced to life imprisonment. He timely perfected this appeal.
Otero raises numerous issues on this appeal, most of which we do not address as we conclude that they were either not properly preserved for our appellate review or lack merit. We do, however, address his challenges to certain arguments made by the prosecutor during closing arguments. Specifically, with reference to Otero's testimony about his whereabouts prior to his arrest, the prosecutor argued as follows:
The other thing about his testimony is, its absence of concreteness. How do you find out if someone was at the park on 36th Street two years ago or if they went to the beach? Very convenient explanation that included nothing solid, nothing concrete, nothing that could be confirmed, just a whole day long of activities out in public that don't involve interaction with anybody else who can confirm it?
Then, this was odd, and I wrote it down not because this is such a great tool, but the point was, I asked him what day of the week it was and he doesn't remember. That in and of itself, isn't *769 that big of a deal. A day of the week two years ago is not likely to be recalled. But if you can go though your itinerary and you remember hourly where you were, wouldn't you know which day it was?
More importantly, wouldn't you know where you were the day before during [sic] the home invasion? That would be something to account for.
The defense objected to this argument and argues on appeal that it impermissibly shifted the burden of proof by commenting on Otero's failure to produce evidence of an alibi when an alibi defense had not been asserted. Due process considerations dictate that the state prove each and every element of an offense beyond a reasonable doubt, and that a defendant has no obligation to present witnesses. See Jackson v. State, 575 So.2d 181, 188 (Fla.1991). Thus, generally speaking, the state may not comment upon a defendant's failure to produce evidence to refute an element of the crime, because doing so could erroneously lead the jury to conclude that the defendant carried the burden of introducing evidence. Id. A narrow exception to this general rule, however, allows the state to comment on the absence of evidence where the defendant voluntarily assumes some burden of proof as by asserting the defenses of alibi, self-defense, and defense of others, or by relying on facts that could be elicited only from a witness who is not equally available to the state. Id.; see also Hayes v. State, 660 So.2d 257 (Fla.1995); Morgan v. State, 700 So.2d 29, 30 (Fla. 2d DCA 1997) (where no alibi defense is asserted, any comment on a defendant's failure to produce alibi witnesses is error).
Contrary to Otero's argument, we cannot conclude that the quoted argument made by the prosecutor somehow shifted the burden to him to produce evidence of an unasserted alibi. Otero took the stand on his own behalf in this case and although he had specific recollection of his activities at or about the time of the charged offenses, he could not remember the day of the week on which such activities occurred. We find the prosecutor's argument regarding this matter to be a logical and fair inference from such testimony. The prosecutor is permitted to argue logical and fair inferences from the defendant's testimony as much as from any other witness' testimony at trial. See Breedlove v. State, 413 So.2d 1, 8 (Fla.1982); see also Craig v. State, 510 So.2d 857, 865 (Fla.1987); State v. Lewis, 543 So.2d 760 (Fla. 2d DCA 1989). Consequently, we find that the trial court did not abuse its discretion when it overruled Otero's objection to this argument.
Otero also asserts that he was denied a fair trial where the prosecutor, over objection, was permitted to tell the jurors, in closing, that they were the "conscience of society." In particular, the prosecutor argued as following:
[STATE]: The function of the jury probably is obvious to you all. It's not just to put up with an inconvenience and waiting on all of us. It's a civic responsibility that, when our nation is not at war, the only one that citizens perform. What you do is, you are the conscience. You are the conscience of society.
[DEFENSE]: Objection; misstatement, Your Honor.
THE COURT: Overruled.
[STATE]: So. Mr. Wolf's argument about being the voice 
[DEFENSE]: Objection; improper argument.
THE COURT: Overruled.
[STATE]:is grounded on your job.
Crime is not pleasant. It's uncomfortable. But you sit as the conscience, and your verdict projects or compels a conscience upon 
[DEFENSE]: Objection. This is misstatement of the law.
THE COURT: Overruled. It's final argument.
[STATE]:someone who does not have it, and that's exactly what your verdict should do.
*770 Florida courts have repeatedly condemned arguments by counsel which impermissibly appeal to the jury's "community conscience" or its sense of "civic responsibility". See Del Rio v. State, 732 So.2d 1100, 1101 (Fla. 3d DCA 1999) (citations omitted). An argument which tells the jury that it sits as the conscience of the community has specifically been found to be inflammatory and impermissible. See Williard v. State, 462 So.2d 102 (Fla. 2d DCA 1985); Carr v. State, 430 So.2d 978 (Fla. 3d DCA 1983). Although we find that the prosecutor's comments in this regard to be improper and we admonish the state from advancing similar arguments in the future, we cannot find this impermissible argument warrants a reversal. Id. First of all, the argument was made at the very end of the state's rebuttal argument and did not otherwise permeate the state's closing arguments. More importantly, however, given the victim's unwavering positive identification of Otero to the police, along with Otero's possession of the victim's car and personal belongings, we conclude that the prosecutor's improper statements to the jury were harmless error. State v. DiGuilio, 491 So.2d 1129, 1132 (Fla.1986).
Accordingly, we affirm the appellant's convictions and sentences.
Affirmed.
RAMIREZ, J. (concurring in part, dissenting in part).
I concur on all points except one for which I would reverse and thus I respectfully dissent. The majority recognizes that the prosecutor's "conscience of the community" argument was error and that the defendant preserved the issue for appellate review. As this court recently stated,
Florida courts have repeatedly stated that counsel should avoid impassioned and prejudicial arguments which impermissibly appeal to the jury's "community conscience" or sense of "civic responsibility."... We are disturbed by the prosecutor's apparent failure to heed these warnings.
Del Rio v. State, 732 So.2d 1100, 1101 (Fla. 3d DCA 1999). See Birren v. State, 750 So.2d 168 (Fla. 3d DCA 2000) (citations omitted). I would affirm if the objection had been sustained and a curative instruction given. But in this case, the error was compounded by the trial court's overruling the defense objection to the argument, thus reinforcing the view that the jury could properly serve as the conscience of society.
The majority finds the error harmless based in part on the fact that the remarks came at the very end of the state's rebuttal argument. Respectfully, in my view, the fact that these were the last words the jury heard from the prosecution gives these remarks more, not less, emphasis.
The majority relies on Carr v. State, 430 So.2d 978 (Fla. 3d DCA 1983), to find the error harmless. First, it is unclear from the Carr opinion whether the defendant objected and what was the trial court's ruling. Furthermore, the court found the evidence was overwhelming because the defendant was found hiding in the warehouse where the crime was committed, the gun and articles stolen from the victim were found within one foot of the hiding place, and the victim identified the defendant as one of the two men involved in the crime. Id. at 979-80. I do not find the evidence in this case to have been overwhelming. Admittedly, the victim's identification was unwavering, but that is not unusual. The dangers of victim misidentification have been well documented.[1] There was no physical evidence presented in this case that corroborated the victim's version over the defendant's account. Angel *771 never testified. There were no latent fingerprints lifted from the victim's apartment that matched Otero's fingerprints.
Furthermore, the harmfulness of the remarks must be evaluated in context. Here, the state continuously referred to Otero and the victim as the predator and the prey. At one point, the prosecutor asked rhetorically, "[w]ho will speak for [the deaf mute victim]?" Although defense counsel did not object to these arguments, I think that when the "conscience of the community" statement was made, the natural inference was that the jury had to speak for the victim and for the community and place this predator behind bars. Thus, I do not believe that the state has met its burden of proving beyond a reasonable doubt that the error complained of did not contribute to the verdict. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). For these reasons, I would reverse.
NOTES
[1] See United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); Bert Black, A Unified Theory of Scientific Evidence, 56 Fordham L.Rev. 595, 654 (1988) ("Wrongful convictions resulting from misidentifications have long been recognized as a serious problem...."); Felice J. Levine & June Louin Tapp, The Psychology of Criminal Identification: The Gap from Wade to Kirby, 121 U. Pa. L.Rev. 1079, 1081-82 (1973) (discussing police practices in obtaining identifications, pointing out that eyewitness unreliability "only underscores the necessity of improving the quality of pretrial identification proceedings...."); Fredric D. Woocher, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan. L.Rev. 969 (1977)("`The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.'") (quoting F. Frankfurter, The Case of Sacco and Vanzetti 30 (1927)); Note, Helping the Jury Evaluate Eyewitness Testimony: The Need for Additional Safeguards, 12 Am. J.Crim. L. 189, 192 (1984) ("eyewitness misidentification is the single most frequent cause of wrongful conviction....").