WELLS, J.
 

 Gerald Lelieve appeals his conviction and sentence for trafficking in cocaine. Lelieve argues three rulings merit reversal: first, the trial court’s denial of his request to discharge counsel and retain different private counsel; second, the trial court’s denial of his motion for mistrial following testimony of a detective who, in violation of a pretrial order, identified the scene of the underlying event as a house which was known as a place where nareot-ics were sold; and third, the trial court’s denial of a mistrial based on the cumulative prejudice of two prosecutorial comments made during closing argument. Because we find no reversible error has been demonstrated, we affirm the order under review.
 

 Lelieve was charged -with a single count of trafficking in cocaine and tried with co-defendant, Augustin Fleurimond, who was charged in the same information with two counts of trafficking in cocaine and two counts of sale of cocaine within 1,000 feet of a school. The day before jury selection was to begin, Lelieve’s counsel advised the trial court that two days earlier he had learned that some witnesses to Lelieve’s arrest, previously thought to be outside the jurisdiction, had returned (or were about to return) and might now be available to provide exculpatory information. Although Lelieve had filed a speedy trial demand just the week before, Lelieve asked the court to strike the speedy trial demand and continue the trial. The request was denied. Lelieve thereupon, following a short break in the proceedings, asked that he be allowed to hire new private counsel. The trial court, stating that it was conducting a
 
 Nelson
 
 inquiry,
 
 [1]
 
 asked Lelieve to specify his reasons for wanting new counsel. After Lelieve explained that although he did not know the whereabouts of the witnesses his attorney had referred to earlier in the ■ day, he wanted a new attorney because he had told his attorney about these witnesses at the start of the ease, but the attorney had done nothing to talk to them. The motion was denied.
 

 The next day, immediately before jury selection, co-defendant Fleurimond’s coun
 
 *626
 
 sel made an
 
 ore terms
 
 motion to preclude the State from introducing evidence concerning prior drug sales from the house where the events in this case took place:
 

 [COUNSEL FOR FLEURIMOND]: The only issue that I have is a Motion in Limine. I’ve noticed in going through some of the depositions that some of the officers said, in response to the question, why did you go to this location, there was
 
 [sic
 
 ] sales years ago or a long time ago at this house.
 

 Just ask the State to inform the witnesses that I don’t think that’s proper in this case, that there was
 
 [sic
 
 ] any sales.
 

 Counsel for Lelieve joined in this motion, which was granted without objection from the State.
 

 Trial commenced the following day. During its short opening statement, the State advised the jury that this case involved police surveillance of a house being watched for drug activity:
 

 [FOR THE STATE]: This is a case about drug-dealing. On October 11th, 2006, police officers were conducting surveillance. A team of police officers were [sic] watching a house, Mr. Fleuri-mond’s house, for drug-dealing activity.
 

 This statement drew no objection from either Fleurimond or Lelieve.
 

 Following equally short opening statements
 
 [2]
 
 from Fleurimond, who focused on inconsistencies in the State’s case, and Le-lieve, who focused on the fact that there was no fingerprint, DNA, photographic, videographic, or audiographic evidence to corroborate the testimony of the State’s witnesses, the State began its case by calling Detective Gayle, one of two officers who conducted a surveillance of a house located at 59th Street and NW 1st Avenue in Miami.
 

 Shortly after Detective Gayle began to testify, the trial court interrupted the prosecutor to inquire whether she had “instructed all of [her] officers as to the Motion in Limine.” The prosecutor responded that she had so instructed only her first two witnesses, Detectives Gayle and Fernandez. She was reminded to advise all of the State’s witnesses that there was to be no testimony about a “high crime area, [or] any previous contact with anybody.” She agreed.
 

 Following this warning, Detective Gayle testified that she was a member of a crime suppression unit which, on the day at issue, consisted of herself and Detective Belfort, who were the “eyeballs” watching a particular house, and a number of additional “takedown” units, comprised of officers who would effectuate the apprehensions and arrests resulting from the operation. According to Detective Gayle, she and Detective Belfort were located inside a van parked directly in front of the house involved, the front door of which was only ten to fifteen feet from their van. Detective Gayle further testified that within twenty minutes of their arrival, she saw a white man walk up to, and knock on, the front door of the house under surveillance. She then saw the door opened by a man she positively identified as co-defendant Fleurimond. Detective Gale then saw the white man hand money to Fleurimond, who briefly closed the door before quickly reopening it and handing a small item to the man at the door. The man then left the house being surveilled and entered a nearby home. The man was not arrested so as to avoid revealing the officers’ presence.
 

 Shortly after this transaction took place, Detective Gayle observed a second transaction during which a black man in a burgundy colored van drove up to the house
 
 *627
 
 being watched. This man also approached the house, knocked on the door and gave money to Fleurimond after Fleurimond opened the door. As before, Fleurimond moved away from the door and returned shortly, to hand a small item to the man at the door. After this man drove off, the nearby takedown teams were advised of the vehicle’s description and direction of travel. The van was stopped and the occupant arrested.
 

 Approximately fifteen minutes later, Gayle observed a third transaction. This time, a white van pulled up to the residence. The driver, a black man positively identified by Detective Gayle as Lelieve, exited the vehicle, approached the front door and knocked. As before, the door was opened by Fleurimond, who took money from Lelieve, went into the house and returned to hand something to Lelieve. Detective Gayle saw Lelieve place in his waistband this item, described as a clear plastic bag, and then leave in the white van. The takedown units were alerted and provided with a description of the vehicle that this man was driving; the vehicle was stopped a short distance away. Lelieve, who was driving the van when it was stopped, was searched and a package containing what subsequently turned out to be almost fifty grams of cocaine was found in Lelieve’s groin area. Lelieve was arrested.
 

 After observing this third transaction, Detective Gayle, in conjunction with another officer, ordered a takedown on the house. According to Detective Gayle, as the takedown officers approached the house, she saw Fleurimond come to the door. After the house was searched, Fleu-rimond was arrested.
 
 [3]
 

 Detective Gayle’s testimony about the details of the transactions that she observed, and Fleurimond’s and Lelieve’s part in those transactions, was corroborated by the testimony of Detective Belfort, the other “eyeball” and the second witness called to testify by the State. After initially being asked to point out on a visual aid the location of the house that he and Detective Gayle were watching and its proximity to a nearby elementary school and park, Detective Belfort was asked to detail where he and Detective Gayle were located while making their observations. Detective Belfort was then asked what happened during the surveillance. He responded, stating:
 

 We were set up at the location. We were doing a — surveillance at our location with — that we knew to be selling narcotics.
 

 Lelieve objected and the jury was sent to the jury room. Lelieve then moved for a mistrial “based on the impermissible testimony by this officer as to the previous criminal activity at the location in question” which counsel equated with “ ‘high crime area’ testimony that has previously been condemned.” Lelieve also argued that the testimony violated the motion in limine granted before trial. The State responded, arguing that the testimony was only common sense testimony explaining why all of these officers were focused on this particular house. Out of the presence of the jury, the trial court agreed with the State’s argument and, with a warning not to make it a feature of the case, deferred on the motion for mistrial which ultimately was denied:
 

 THE COURT: Well, actually it’s an interesting argument, and I’m going to defer on the motion for mistrial because
 
 *628
 
 I’m not sure that I disagree with the Statement. I mean, the testimony was that they were conducting a surveillance of this particular house, and a reasonable inference is that they — they didn’t just wake up one morning and say, let me go to 59th Street and 22nd Avenue, wherever this particular place was, and let me watch it.
 

 There had to be a basis. Now, I don’t know what more is going to come. I don’t know if there is going to be to be [sic] additional statements could create an issue, but right now my gut is to say that I’m going to deny the motion.
 

 But instead of saying, that, because I don’t know what else is coming, I’m going to defer on the Defense’s Motion for Mistrial.
 

 I will also note that the case law actually talks about a distinction between a single isolated comment and a comment that becomes — my words, not the case law’s word — a feature of the case, meaning there is multiple mentions.
 

 The State attorney stands up and makes argument during closing that type of thing that could give rise to a mistrial.
 

 At this time I just don’t think it rises to that level.
 

 After hearing counsel for Fleurimond, the court reiterated that it was deferring on the motion for mistrial and noted that Fleurimond’s objection was preserved. Outside the hearing of the jury, the court instructed the officer to make no further mention of a high crime area or persons law enforcement had contact with at that location. No further mention of the officers’ reasons for watching this particular house was made by any of the other five detectives who testified about the surveillance, the takedowns, the searches, the items seized, and the arrests.
 

 Both Fleurimond and Lelieve testified at trial. Fleurimond’s testimony was that he had never gone to the door of the house being surveilled and that he was there only to take a shower because the plumbing at his house was not working. Lelieve testified that he was from Orlando and only in Miami to assist the owner of the van that he was driving in transporting passengers to and from those two cities. He maintained that on the day at issue, the van had stopped across the street from the house in question to pick up a passenger, who never appeared; that no one left the van while at the location in question; and that the drugs found on him were planted by the police to deflect claims of police brutality stemming from a beating they allegedly inflicted on him during his arrest.
 

 At the conclusion of the testimony, the court reduced Fleurimond’s two charges for sale of cocaine within 1000 feet of a school to two counts of possession of cocaine with intent to sell. The court did so because there was no testimony as to the distance between the drug-house and the nearby elementary school. Despite this ruling, the State advised the jury in its initial closing argument that the house at issue was next to a school. It also told the jury that Fleurimond had been caught flushing drugs down the toilet. There was also no evidence to this effect, and Fleuri-mond timely objected to both arguments. Lelieve raised no objections whatsoever during the State’s initial closing argument.
 

 Fleurimond’s closing focused primarily on inconsistencies between Detective Gayle and Detective Belfort’s testimony. He also emphasized the fact that there we no fingerprints or photographs of the events about which these officers testified, and he challenged the State to “[s]how me a video. Show me a picture,” of what the detectives said had transpired. Lelieve’s closing continued along these lines with
 
 *629
 
 the claim that there was no corroboration of the officers’ testimony which, according to Lelieve, had to be confirmed by an independent source of physical evidence.
 

 Against this backdrop, the State argued in rebuttal that no physical corroboration was necessary and that common sense dictated that officers watching a place for drug transactions do not exit their vehicles to make videos or take photographs. Finally, after using all of the time allotted to it for closing argument and being told to “wrap it up,” the State started to argue that, while the defendants thought it unfair that no photographs or videotapes of then’ alleged wrongdoing existed, there was some unfairness on both sides. But before the State could get its argument out, it was interrupted by an objection from Fleu-rimond:
 

 [FOR THE STATE]: Earlier — and I’m wrapping it up, Judge, — earlier [counsel for Fleurimond] indicated it wasn’t fair to his Defendant, to his client ... that we didn’t have the video. It wasn’t fair; that this lack of evidence wasn’t fair.
 

 Well, how fair is it to Miami-Dade County that there’s people out there, these two individuals—
 

 [COUNSEL FOR FLEURIMOND]: Object to that, Judge.
 

 The objection was sustained.
 

 After the jury was charged and retired, Fleurimond moved for a mistrial based on the State’s arguments related to “the flushing incident” about which there was no evidence; the location of the school, again about which there was no evidence; and the “fair[ness]” to Miami-Dade County. The motion was denied. After the motion was denied, the court asked counsel for Lelieve if he was joining in the motion for mistrial, to which he responded “[t]o the extent that it applies to Mr. Lelieve, Judge.”
 

 Fleurimond was found guilty on two counts, Lelieve on one, of trafficking in cocaine. Fleurimond and Lelieve have separately appealed their convictions and sentences. We now address the arguments made by Lelieve, each of which we reject as a basis for reversal.
 

 First, we cannot agree that Le-lieve is entitled to a reversal because his request for new private counsel was denied. While we agree that a “criminal defendant has the right to select his own private counsel,” that right does not operate for the purposes of delaying or “otherwise subverting] judicial proceedings.”
 
 Fratcher v. State,
 
 842 So.2d 1044, 1046 (Fla. 4th DCA 2003);
 
 see Holley v. State,
 
 484 So.2d 634, 636 (Fla. 1st DCA 1986) (stating that “[a] defendant’s right to choose his own attorney is not absolute and cannot be invoked in bad faith, for the sake of arbitrary delay or to otherwise subvert judicial proceedings”). In this case, the trial court correctly recognized Lelieve’s request for new counsel, following on the heels of the denial of his motion for a continuance (both of which were predicated, in significant part, on the same facts), was made only for the purpose of delaying the trial. Under the circumstances, the motion was properly denied.
 
 See United States v. Silva,
 
 611 F.2d 78, 79 (5th Cir.1980) (holding that the trial court did not abuse its discretion when denying a defendant’s oral motion for substitution of counsel the day before trial because the “freedom to have counsel of one’s own choosing may not be used for the purposes of delay”);
 
 Hurtado v. State,
 
 760 So.2d 279, 280 (Fla. 4th DCA 2000) (confirming that a trial court has the discretion to consider the public’s interest in the fair and orderly administration of justice in denying a defendant’s request for a different attorney).
 

 
 *630
 
 Second, while we agree that Detective Belfort’s statement that the police were watching a house “that we knew to be selling narcotics” was improper, we do not agree that the comment mandated a mistrial below or reversal of Lelieve’s conviction here. In
 
 Lowder v. State,
 
 589 So.2d 933, 935 (Fla. 3d DCA 1991), and
 
 Hill v. State,
 
 980 So.2d 1195 (Fla. 3d DCA 2008), this court held that testimony that impugns the reputation of a place is impermissible because it proves nothing material and is prejudicial. However, as explained in
 
 Goodwin v. State,
 
 751 So.2d 537, 541 (Fla.1999), error in admitting such evidence is subject to the DiGuilio
 
 [4]
 
 harmless error test which “places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.”
 
 See Hill,
 
 980 So.2d at 1199 (“The final question is whether the errors are harmless beyond a reasonable doubt.”).
 

 Thus, “the mere identification of a location as a high-crime area does not support a finding of undue prejudice and a per se reversal in all cases.”
 
 Lubin v. State,
 
 754 So.2d 141, 143 (Fla. 4th DCA 2000) (quoting
 
 Wheeler v. State,
 
 690 So.2d 1369, 1370 (Fla. 4th DCA 1997)). Rather, a determination of whether undue prejudice exists, and whether reversible error has been demonstrated, depends on the facts of each case in which such a comment has been made:
 

 Although comments that the defendant was arrested in a high-crime area are often prejudicial and constitute reversible error,
 
 Sherrod v. State,
 
 582 So.2d 814 (Fla. 4th DCA 1991), the supreme court has held that such comments do not
 
 per se
 
 warrant reversal.
 
 Gillion v. State,
 
 573 So.2d 810 (Fla.1991). Instead, reviewing courts must consider whether prejudice exists based on the facts of each case.
 
 Id.
 
 at 812.
 

 Watson v. State,
 
 672 So.2d 71, 72 (Fla. 4th DCA 1996);
 
 see also Lubin,
 
 754 So.2d at 143 (concluding that the existence of undue prejudice stemming from testimony regarding a high crime area or other drug dealing activity “depends on the facts of each case”).
 

 As the Fifth District Court of Appeal observed in
 
 Johnson v. State,
 
 670 So.2d 1121, 1123 (Fla. 5th DCA 1996), reversible error most commonly is found in cases where such references are made a feature of the trial or are offered solely to establish bad character or propensity, rather than to explain a chain of events observed. They also have been viewed as less harmful where the defendant denies being present for the transaction:
 

 The admission of [high-crime or drug area] evidence does not constitute per se reversible error, however. Rather, the question of whether a statement that a transaction took place in a “high drug area” is unduly prejudicial to a defendant depends on the facts and circumstances associated with each case.
 
 Black v. State,
 
 578 So.2d 1102 (Fla. 1991);
 
 Gillion v. State,
 
 573 So.2d 810 (Fla.1991);
 
 Jefferson v. State,
 
 560 So.2d 1374 (Fla. 5th DCA),
 
 review denied,
 
 574 So.2d 141 (Fla.1990).... Courts also consider whether the testimony is being offered to establish a chain of events or whether it is being offered solely to establish bad character or propensity.
 
 Dorsey v. State,
 
 639 So.2d 158 (Fla. 1st DCA 1994). Such references are also considered by some courts to be less harmful in those cases in which the defendant denies being present during the
 
 *631
 
 transaction, since under these circumstances the defendant is less likely to be convicted through “guilt by association.”
 
 See Davis v. State,
 
 562 So.2d 443 (Fla. 2d DCA 1990). Where an “isolated characterization of a neighborhood was a brief comment and was not repeated in the remaining testimony or mentioned in closing,” the error has been considered harmless and deemed insufficient to provide a basis for reversal on appeal.
 
 Davis,
 
 562 So.2d at 444.
 

 Johnson,
 
 670 So.2d at 1123.
 

 On this analysis,
 
 Johnson
 
 held that a prosecutor’s passing comment in opening statement that a drug transaction occurred in “problem drug area” did not require a mistrial because the comment was merely setting up the chain of events and did not become a feature of the trial.
 
 Id.
 
 The Fourth District Court of Appeal in
 
 Watson
 
 similarly held that a police officer’s single comment in a “buy-bust” prosecution that “ ‘undercover officers will go out and attempt to make purchases of narcotics in narcotics areas,’ ” did not constitute reversible error because “the officer’s comments did not unduly prejudice the jury since they amounted to mere background information and not an attempt to impugn the area’s reputation.”
 
 Watson,
 
 672 So.2d at 72.
 

 Here, Detective Belfort made a single isolated comment that the house the surveillance team was watching was known for selling drugs. The comment was made in the context of, and to explain, the chain of events, that is, what the team was doing at that particular location. No further mention was made of the reason for the surveillance by any of the other officers who testified at trial, nor was it mentioned in closing argument. Moreover, this testimony came after the jury had been told, without objection, in opening statement that this house was being watched for drug-dealing activity and after Detective Gayle had testified in detail as to the surveillance of this house and three drug transactions that she observed. On this record, undue prejudice mandating reversal stemming from this single comment has not been demonstrated.
 

 We also note that Lelieve’s defense was that he was not the person identified by Detective Gayle as the individual who took part in the third drug transaction at the drug-house. In fact, Lelieve took the stand in his own defense and testified that he was in the neighborhood to pick up someone at another home; that neither he nor anyone else get out of the vehicle; that he did not approach the drug-house; and that he did not participate in any drug transaction. As noted in
 
 Johnson,
 
 some courts view comments about drug areas to be less harmful where the defendant denies being present at all, since under these circumstances the defendant is less likely to be convicted through “guilt by association.”
 
 Johnson,
 
 670 So.2d at 1123 (citing
 
 Davis v. State,
 
 562 So.2d 443 (Fla. 2d DCA 1990)). In
 
 Clark v. State,
 
 924 So.2d 922, 924 (Fla. 3d DCA 2006), for example, this Court concluded that “repeated reference to the location where [the defendant] was arrested as a place known for narcotics activity” was not so prejudicial as to mandate a mistrial because the issue was identification of the defendant as the individual involved in the drug sale, not whether the crime was committed.
 

 Considering the evidence presented, the arguments made, and the defenses asserted in this case as to defendant Lelieve, we conclude that there is no reasonable possibility that the detective’s comment affected the verdict.
 

 Finally, we find no abuse of discretion in the trial court’s denial of Lelieve’s motion for mistrial based on two comments made during the State’s closing argument.
 
 *632
 

 See Smith v. State,
 
 818 So.2d 707, 710 (Fla. 5th DCA 2002) (confirming denial of a motion for mistrial is reviewed for an abuse of discretion). The first improper argument Lelieve points to was the prosecutor’s wholly unsupported statement that the drug-house at issue was located close to a school. Only Fleurimond, not Lelieve, had been charged with trafficking within 1000 feet of a school and Fleurimond alone objected to this comment. Under the circumstances we do not believe that the comment had any effect on the jury’s consideration of the charge brought against Lelieve.
 

 The second comment Lelieve points to is the prosecutor’s reference to the community. While calls upon the “conscience of the community” made during closing argument are inappropriate, they do not in all cases mandate a mistrial. As the Florida Supreme Court in
 
 Goodwin
 
 stated, “a motion for mistrial ‘should be granted only when it is necessary to ensure that the defendant receives a fair trial.’ ”
 
 Goodwin,
 
 751 So.2d at 547 (quoting
 
 Cole v. State,
 
 701 So.2d 845, 853 (Fla. 1997)).
 

 In this case, both Fleurimond and Le-lieve asserted a “CSI” defense during closing. They both claimed that the detectives’ testimony of the drug transactions they observed was uncorroborated by photographs, videotapes, fingerprints, or other physical evidence. In rebuttal, the prosecutor pointed out that Lelieve had argued that it was unfair of the State not to provide a videotape of the transactions. The prosecutor then stated “[wjell, how fail- is it to Miami-Dade County that there’s people out there, these two individuals.” However, before the prosecutor could finish this sentence, Lelieve objected, and the trial court ordered the prosecutor to wrap up the State’s closing argument. No further argument in this vein was made.
 

 While a call on the community’s conscience would have been impermissible, it was interrupted by the objection. Under the circumstances, we cannot say that either this comment or that regarding the school, whether considered alone or in combination was so prejudicial as to vitiate the entire trial, materially contribute to Lelieve’s conviction, or cause the jury to reach a more severe verdict than it otherwise would have reached.
 
 See Lewis v. State,
 
 780 So.2d 125, 131 (Fla. 3d DCA 2001) (stating that comments made during closing should be reviewed to determine whether they (1) deprive the appellant of a fair trial; (2) materially contribute to a conviction; (3) are so harmful or fundamentally tainted as to require a new trial; (4) are so inflammatory that it might have influenced the jury to reach a more severe verdict than that which they would have reached otherwise);
 
 see also Smith,
 
 818 So.2d at 710-11 (observing that the abuse of discretion standard applied to denials of motions for mistrial requires determining whether an isolated and limited comment is so prejudicial that it vitiates the entire trial);
 
 Otero v. State,
 
 754 So.2d 765, 770 (Fla. 3d DCA 2000) (concluding that a “conscience of the community” argument made “at the very end of the state’s rebuttal argument,” although improper, was harmless error given “the victim’s unwavering positive identification of [the defendant]”). Reversal on this claim also is not warranted.
 

 Accordingly, the conviction and sentence at issue are affirmed.
 

 [1]
 

 . Since Lelieve was not asking for new court-appointed counsel, but asking instead for permission to hire new private counsel, the court misspoke in characterizing its questioning as a
 
 Nelson
 
 inquiry. "A
 
 Nelson
 
 inquiry is appropriate when an indigent defendant attempts to discharge current, and obtain new, court-appointed counsel prior to trial due to ineffectiveness.”
 
 Branch v. State,
 
 685 So.2d 1250, 1252 (Fla.1996);
 
 Foster v. State,
 
 704 So.2d 169, 172 (Fla. 4th DCA 1997).
 

 [2]
 

 . All three opening statements comprised a total of nine transcript pages.
 

 [3]
 

 . Detective Gayle testified that after officers entered the residence, a number of items, including scales, chemical agents, staples, sta-piers, baggies, marijuana, and cocaine were brought to her by the officers who went into the house. ,
 

 [4]
 

 .
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1135 (Fla. 1986).